UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| LOWER BRULE SIOUX TRIBE, A FEDERALLY RECOGNIZED INDIAN TRIBE;<br><br>Plaintiff,<br><br>vs.<br><br>HON. DEB HAALAND, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR, OR HER SUCCESSOR IN OFFICE; UNITED STATES DEPARTMENT OF INTERIOR, BRYAN NEWLAND, ACTING ASSISTANT SECRETARY OF THE INTERIOR FOR INDIAN AFFAIRS, OR HIS SUCCESSOR IN THE OFFICE; DARRYL LACOUNTE, DIRECTOR OF THE BUREAU OF INDIAN AFFAIRS; UNITED STATES BUREAU OF INDIAN AFFAIRS, KRISSANNE STEVENS, OR HER SUCCESSOR, AWARDING OFFICIAL FOR THE BUREAU OF INDIAN AFFAIRS GREAT PLAINS REGION; AND THE UNITED STATES OF AMERICA,<br><br>Defendants. | 3:21-CV-03018-RAL<br><br><br>OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS |

The Lower Brule Sioux Tribe ("the Tribe") entered into a self-determination contract under the Tribally Controlled Schools Act ("TCSA") with the federal government, in which the Tribe received federal funds to operate tribal schools that otherwise would have been operated by the federal government. Doc. 1 at 1–2. The Tribe brought this Complaint against the Bureau of Indian Affairs ("BIA"), the Department of Interior ("DOI"), and its representatives Deb Haaland, Bryan

1

Newland, Darryl LaCounte, and Krissane Stevens (collectively "Defendants"), seeking to enjoin Defendants from collecting debt incurred by the Tribe and entering declaratory judgment relief. Doc. 1. Defendants filed a motion to dismiss, Doc. 9, which this Court grants in part.

## I. Facts, Procedural History and Legal Context of Claims

### A. The Indian Self-Determination and Education Assistance Act ("ISDEAA"), the Contract Disputes Act ("CDA"), and the TCSA

Congress passed the ISDEAA in 1975 to allow Indian tribes to assume control of federally administered educational and social programs. 25 U.S.C. § 5302; Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1456 (10th Cir. 1997); see also Stathis v. Marty Indian Sch. Bd. Inc., 560 F. Supp. 3d 1283, 1298 (D.S.D. 2021) ("Congress has made clear that having Native American communities and tribes control the education of their children promotes [tribal self-determination and cultural autonomy]."). "Congress enacted the ISDEAA to encourage Indian self-determination and tribal control over administration of federal programs for the benefit of Indians, by authorizing self-determination contracts between the United States, through the Secretaries of the Interior and of Health and Human Services, and Indian tribes." Demontiney v. United States ex rel. Dep't of Interior, Bureau of Indian Affs., 255 F.3d 801, 806 (9th Cir. 2001) (citation omitted). Pursuant to these contracts, "Secretaries [of the Interior and of Health and Human Services] are required to transfer resources and control of those programs to the tribe." Ramah Navajo Chapter, 112 F.3d at 1456.

"In 1988, Congress amended the ISDEAA to waive federal sovereign immunity in federal district court for certain contract claims" brought by tribes under the statute. Demontiney, 255 F.3d at 806. The ISDEAA Amendments provide:

> The United States district courts shall have original jurisdiction *over any civil action or claim against the appropriate Secretary arising under this chapter and, subject to the provisions of [25 U.S.C. § 5331(d)] and concurrent with the United*

2

> *States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this chapter.* In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under <u>section 5321(a)(2)</u> of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 5331(a) (emphasis added). In turn, § 5331(d) incorporates the CDA to claims brought under the ISDEAA. <u>See</u> § 5331(d) (stating "Chapter 71 of Title 41 shall apply to self-determination contracts" brought under this chapter). In short, both the ISDEAA and the CDA govern disputes between the federal government and a tribe arising under the ISDEAA. <u>See</u> <u>Swinomish Indian Tribal Cmty v. Azar</u>, 406 F. Supp. 3d 18, 24 (D.D.C. 2019) (holding the CDA and ISDEAA gave a federal district court subject matter jurisdiction over a claim brought by a tribe against the federal government arising from a self-determination contract).

Like the ISDEAA, "the CDA is a statute waiving sovereign immunity." <u>M. Maropakis Carpentry, Inc. v. United States</u>, 609 F.3d 1323, 1329 (Fed. Cir. 2010) (citation omitted). The CDA governs disputes arising from an express or implied contract between an executive agency of the federal government and the contracting party. 41 U.S.C. § 7102. "Congress enacted the CDA [in 1978] to provide a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving government contract claims." <u>Montano Elec. Contractor v. United States</u>, 114 Fed. Cl. 675, 680 (2014) (cleaned up and citation omitted). In relevant part, the CDA provides the following avenues for appealing a federal agency's decision concerning a contracting party, such as a tribal recipient of a self-determination contract:

> (a) Appeal to agency board.--A contractor, within 90 days from the date of receipt of a contracting officer's decision under section 7103 of this title, may appeal the

3

decision to an agency board as provided in section 7105 of this title [to the Civilian Board of Contract Appeals ("CBCA")].

(b) Bringing an action de novo in Federal Court.--

(1) In general. . . . in lieu of appealing the decision of a contracting officer under section 7103 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary. . . .

. . . .

(3) Time for filing.--A contractor shall file any action under paragraph (1) . . . *within 12 months from the date of receipt of a contracting officer's decision under section 7103 of this title.*

41 U.S.C. § 7104 (a)–(b) (emphasis added). Because the ISDEAA incorporates the CDA, a federal district court has concurrent jurisdiction with the United States Court of Federal Claims over a claim arising from the ISDEAA to decide a claim "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b); see also Demontiney, 255 F.3d at 806 (holding that § 5331(a), (d) of the ISDEAA grant a federal "district court concurrent jurisdiction [with the U.S. Court of Federal Claims] over suits against the federal government for contract claims arising under 'self-determination contracts' as defined by the ISDEAA").

The Code of Federal Regulations summarizes a tribal grant recipient's appeal rights succinctly: "You may appeal [a final] decision [under the ISDEAA] to the Civilian Board of Contract Appeals (CBCA) . . . within 90 days from the date you receive [the final] decision. . . . Instead of appealing to the CBCA, you may bring an action in the U.S. Court of Federal Claims or in the United States District Court *within 12 months of the date you receive*" notice of the final decision. 25 C.F.R. § 900.222 (emphasis added). An appeal must be timely commenced under the CDA as incorporated by the ISDEAA, otherwise a "contracting officer's decision on a claim is final and conclusive and is not subject to review by any forum, tribunal, or Federal Government

4

agency, unless an appeal or action is timely commenced as authorized by this chapter." 41 U.S.C. § 7103(g).

In 1988, the same year the ISDEAA was amended to incorporate the CDA, Congress enacted the TCSA, which "requires the Secretary of the Interior to award grants to Indian tribes or tribal organizations to operate schools on their reservations if requested by a tribe." Shiprock Associated Sch., Inc. v. United States, 934 F. Supp. 2d 1311, 1313 (D.N.M. 2013); 25 U.S.C. § 2501. Like the ISDEAA, the TCSA was enacted "to assure maximum Indian participation in the direction of educational services." 25 U.S.C. § 2501; Stathis, 560 F. Supp. 3d at 1298 (citation omitted). A tribal grant recipient under the TCSA is authorized to use federal funds to operate tribal schools in compliance with the provisions of the statute. 25 U.S.C. § 2502.

The TCSA requires a tribal grant recipient to complete an annual report and financial audit pursuant to the Single Audit Act of 1984 on the tribe's use of federal funds, which the BIA reviews to ensure the tribe's compliance with the provisions of the TCSA. 25 U.S.C. § 2505(b). The tribal grant recipient must submit the annual report and financial audit to the tribal governing body of the tribally controlled school. 25 U.S.C. § 2505(b)(4)(A). Further, the tribal grant recipient "shall send a copy of the report to the Secretary [of the Interior]" ("the Secretary") within thirty days of "receiving written confirmation that the tribal governing body has received the report." 25 U.S.C. § 2505(b)(4)(B).

Upon reviewing the annual report and financial audit, if the Secretary determines that the tribal school has not complied with the TCSA and the federal government should resume control of the tribal school, the Secretary must:

> (A) provide[] notice to the tribally controlled school and the tribal governing body
> . . . of the tribally controlled school which states--

(i) the specific deficiencies that led to the revocation or resumption determination; and

(ii) the actions that are needed to remedy such deficiencies; and

(B) afford[] such authority an opportunity to effect the remedial actions.

25 U.S.C. § 2505(c)(2). The TCSA also imposes a duty on the Secretary to assist a tribe in taking remedial action, stating "[t]he Secretary shall provide such technical assistance to enable the school and governing body to carry out such remedial actions." 25 U.S.C. § 2505(c)(3).

Significantly, the TCSA incorporates the ISDEAA, and by doing so thereby incorporates the CDA, to govern disputes arising from a TCSA contract: "Any exception or problem cited in an audit conducted pursuant to section 2505(b)(1) of this title [the TSCA's annual reporting requirement] . . . shall be administered under the provisions governing such exceptions, problems, or *disputes in the case of contracts under the Indian Self-Determination and Education Assistance Act.*" 25 U.S.C. § 2507(e) (emphasis added). As discussed, § 5331(a) of the ISDEAA then states that a federal court's jurisdiction over "any civil action or claim against the appropriate Secretary arising under this chapter [is] *subject to the provisions of [the CDA] and concurrent with the United States Court of Claims.*" 25 U.S.C. § 5331(a) (emphasis added). Therefore, pursuant to the ISDEAA and the CDA, a TCSA tribal grant recipient must file any federal district court action concerning a TCSA contract dispute with the federal government within twelve months of the receipt of the government's final decision. 25 U.S.C. § 2507(e); 25 U.S.C. § 5331(a); 41 U.S.C. § 7104. Otherwise, a federal court may not exercise jurisdiction, and the action is barred. 41 U.S.C. § 7103(g).

The Tribe was a TCSA grant recipient. Doc. 1 at 1–2; Doc. 10 at 2; Doc. 12 at 2. As a contracting party to a TCSA self-determination contract, the Tribe was required to complete an annual report and financial audit on its use of TCSA funds and to submit the report to the Secretary

of the Interior.  25 U.S.C. § 2505(b)(4)(B).  This case arises from the BIA's final determinations on the Tribe's audit reports for the 2016, 2017, and 2018 fiscal years and BIA collection actions that ensued.

### B. The BIA's Findings and Determinations Reports from 2012 to 2016

From the 2012 to 2019 fiscal years, the Tribe overspent its general fund and, although TCSA funds were earmarked for use on tribal schools, used TSCA funds to cover the deficit in its general fund as a form of "short-term borrowing." Doc. 1 at 9–16, 19–20. The BIA refers to this use of TCSA funding for unauthorized purposes as generating a "unearned revenue" deficit. Doc. 12-4 at 1.

From fiscal year 2012 to fiscal year 2015, the BIA allowed the Tribe to continue its practice of "borrowing" TCSA funds to cover its general deficit without issuing a bill of collection to recover the unearned revenue deficit. Doc. 1 at 19–20. The Tribe justified overspending reflected in the 2012, 2013, 2014, and 2015 audit reports by stating "its equity in capital assets and other equity were sufficient to offset the deferred revenue." Doc. 1 at 19. According to the Tribe, the BIA implicitly accepted the Tribe's position and "declined to issue a bill of collection" for the Tribe's unearned revenue deficit in the BIA's 2012, 2013, 2014, and 2015 findings and determination reports. Doc. 1 at 20.

The BIA changed this practice and sought to collect the Tribe's "unearned revenue" deficit from TCSA funds following its 2016 Findings and Determinations Report ("2016 Report") prepared in response to the Tribe's 2016 annual financial audit report. Doc. 1 at 12; Doc. 10 at 9–10; Doc. 12 at 2–3; Doc. 12-1; Doc. 12-3. Krissanne Stevens ("Stevens") was the BIA officer tasked with reviewing the Tribe's 2016 annual audit report pursuant to 25 U.S.C. § 2505(b) and preparing the 2016 Report. Doc. 1 at 9, 12; Doc. 12 at 2–3; Doc. 12-1; Doc. 12-3.

Before the 2016 Report was finalized, through an internal memo dated November 9, 2017, Michael Chatmon ("Chatmon") of the Division of Internal Evaluation and Assessment ("DIEA") informed Danelle Daughtery, the BIA's Acting Regional Director of the audit oversight agency over the Tribe, that the Tribe's capital assets should not be considered as collateral for any unearned revenue deficit. Doc. 1 at 11. Chatmon stated,

> [Indian Affairs] advanced funds (deferred revenue) must be maintained in *cash and/or short-term investments* and must be readily available for program expenses. [Indian Affairs] advanced funds (deferred revenue) cannot be covered *by a capital asset* that must be sold in order to generate cash needed to sustain an [Indian Affairs] program.

Doc. 1 at 11 (emphasis added). The Tribe did not receive notice of this memo until April 14, 2021, when Stevens shared the memo with the Tribe via email. Doc. 1 at 11–12. At that time, Stevens informed the Tribe that Chatmon's conclusions "really put [the] BIA in a bind for accepting the Tribe's previous response" to the BIA's findings for the 2012, 2013, 2014, and 2015 reports. Doc. 1 at 11–12.

Regardless, on February 22, 2018, the BIA mailed the Honorable Boyd Gourneau, Chairman of the Tribe ("Chairman Gourneau"), the 2016 Report via certified mail. Doc. 10 at 9; Doc. 12 at 2; Doc. 12-1. Trish Lundell[1] signed for the mail on March 5, 2018. Doc. 10 at 9; Doc. 12 at 2; Doc. 12-2. The 2016 Report included a cover letter stating that the Tribe had a right to appeal, as set forth in the ISDEAA and CDA, to the CBCA within ninety days of its receipt of the report or with the U.S. Court of Federal Claims within twelve months of the date of receipt. Doc. 10 at 9; Doc. 12-1 at 1. The cover letter omitted the Tribe's right to appeal to a federal district court within twelve months of receipt of the report. Doc. 10 at 9; Doc. 12-1 at 1–2. The letter also

---

[1] The briefing does not reveal Trish Lundell's occupation.

stated that the Tribe could contact Debra Martin, a self-determination specialist for the Great Plains region, with any questions. Doc. 12-1 at 2.

In the 2016 Report, Stevens found that the Tribe had overspent its general funds and used its TCSA funds to cover the deficit as a form of short-term borrowing. Doc. 1 at 12; Doc. 10 at 10; Doc. 12 at 3. The overspending or "questioned costs" totaled $6,122,556, which Stevens concluded was ineligible for reimbursement from the federal government under the Tribe's TCSA contract. Doc. 1 at 12; Doc. 10 at 10; Doc. 12 at 3; Doc. 12-1 at 5. The report further noted that the Tribe did not dispute these findings, and the Tribe notified the BIA that it would "strive to maintain the funds for federal programs in the restrictive savings account and transfer as needed to cover expenditures" in the future. Doc. 10 at 10; Doc. 12 at 3.

As the Tribe had not disputed the 2016 Report's findings, the BIA issued a bill of collection for the $6,122,556 in questioned costs along with the 2016 Report. Doc. 1 at 12; Doc. 10 at 9; Doc. 12 at 3; Doc. 12-1 at 6; Doc. 12-3. The BIA suspended collection efforts on March 8, 2018, after receiving some additional information from the Tribe in response to the 2016 Report.[2] Doc 1 at 12; Doc. 10 at 10; Doc. 12 at 4. Rather than resume collection efforts, the BIA decided to tack the remaining debt the Tribe owed pursuant to the 2016 Report to any bill of collection issued pursuant to the BIA's 2017 findings and determination report ("2017 Report"). Doc. 10 at 10; Doc. 12 at 4. The Tribe did not appeal the 2016 Report's findings to the CBCA, U.S. Court of Federal Claims, or to a federal district court until filing the complaint in this case on October 8, 2021. Doc. 1.

### C. BIA's Findings and Determinations Report from 2017

---

[2] The pleadings fail to specify what type of information was received. Doc. 10 at 10; Doc. 12 at 4.

The BIA mailed Chairman Gourneau the 2017 Report on March 20, 2019, by certified mail. Doc. 10 at 11; Doc. 12 at 4; Doc. 12-4 at 1; Doc. 12-6. Trish Lundell signed for the mail in March 2019. Doc. 10 at 11; Doc. 12 at 4; Doc. 12-5. Like the year before, the 2017 Report included a cover letter notifying the Tribe of its right to appeal to the CBCA within ninety days of the receipt of the report or the U.S. Court of Federal Claims within twelve months of the date of receipt. Doc. 10 at 11; Doc. 12 at 4; Doc. 12-4 at 1. The cover letter also stated that the 2017 Report was the BIA's final decision and that the Tribe could contact Debra Martin with questions. Doc. 12-4 at 1–2.

In the 2017 Report, Stevens questioned costs of $3,679,223 and issued a bill of collection for that amount. Doc. 10 at 11; Doc. 12 at 5; Doc. 12-4 at 4. Like the year before, Stevens found that the Tribe continued to use TCSA grant money to cover the deficit from the Tribe's general fund as a form of short-term borrowing. Doc. 1 at 13; Doc. 10 at 11; Doc. 12 at 5. Stevens further found that the Tribe did not have enough cash assets to reimburse the $3,679,223 in questioned costs or "unearned revenue" deficit created by the Tribe's overspending. Doc. 12-4 at 3. As of September 30, 2017, the report noted that the Tribe's overall unearned revenue deficit was $9,669,487, which exceeded the Tribe's unrestricted cash and cash equivalent assets by $8,729,785. Doc. 12-4 at 3.

Like the year before, the report stated that the Tribe had admitted to overspending and stated it would "strive to maintain the funds for federal programs in the restricted savings account and transfer as needed to cover expenditures." Doc. 10 at 11; Doc. 12 at 5; Doc. 12-4 at 4. In the report, Stevens recommended that the Tribe "develop and enforce internal control policies and procedures to ensure cash balances equal or exceed unearned revenue balances related to advanced grant monies" to remedy the Tribe's pattern of overspending and misuse of TCSA funds. Doc.

10

12-4 at 4. Significantly, the 2017 Report also notified the Tribe that the BIA would issue a payment restriction letter barring the Tribe from receiving additional TCSA funds. Doc. 1 at 13; Doc. 10 at 11; Doc. 12 at 5; Doc. 12-4 at 4.

On March 27, 2019, about a week after receipt the 2017 Report, Chairman Gourneau mailed Stevens a letter responding to the report on behalf of the Tribe. Doc. 18 at 2; Doc. 18-1. Chairman Gourneau's letter did not dispute the BIA's calculations of "questioned costs" or "unearned revenue" deficit. Doc. 18-1 at 1. However, Gourneau challenged the report's conclusion that the Tribe did not have collateral to cover its unearned revenue deficit, stating that the Tribe's "net unrestricted assets and *amounts invested in capital assets* would be sufficient equity to cover [the unearned] revenue deficit" (emphasis added). Doc. 18-1 at 1. The Tribe claims it did not receive any response to Chairman Gourneau's March 27, 2019 letter, and it did not receive any payment restriction letter as referenced in the 2017 Report until April 22, 2021. Doc. 1 at 14; Doc. 17 at 2–3.

The BIA issued a bill of collection around April 9, 2019, for the $3,679,223 in questioned costs in the 2017 Report. Doc. 10 at 11; Doc. 12 at 5; Doc. 12-6. The bill of collection was inactivated on October 21, 2021, after the commencement of this lawsuit. Doc. 12 at 5. The Tribe did not appeal the BIA's 2017 Report to the CBCA, U.S. Court of Federal Claims, or a federal district court until filing this action on October 8, 2021. Doc. 12 at 5.

### D. BIA's 2018 Findings and Determinations Report ("2018 Report")

On November 5, 2019, the BIA mailed the Honorable Clyde J.R. Estes, the new chairman of Lower Brule Sioux Tribe ("Chairman Estes"), the 2018 Report by certified mail. Doc. 10 at 12; Doc. 12 at 6; Doc. 12-7. Trish Lundell signed for the mail on November 8, 2019. Doc. 10 at 12; Doc. 12 at 6; Doc. 12-8. In its complaint, the Tribe claims it did not receive this report. Doc. 1 at

11

15. Like in previous years, the cover letter stated that the Tribe had a right to dispute the 2018 Report to the CBCA within ninety days and the U.S. Court of Federal Claims within twelve months of receipt of the report. Doc. 10 at 12–13; Doc. 12 at 6; Doc. 12-7 at 1. It also told the Tribe to contact Debra Martin, a BIA self-determination specialist, with questions. Doc. 12-7 at 2.

The 2018 Report questioned costs of $3,552,860. Doc. 10 at 13; Doc. 12 at 6; Doc. 12-7 at 4. Again, Stevens found that the Tribe continued its practice of borrowing "forward-funded grant monies to fund other programs and general fund activities." Doc. 10 at 13; Doc. 12 at 6; Doc. 12-7 at 3. The report noted that the Tribe responded that it would "continue to look for ways to improve oversight over accounting records." Doc. 10 at 13; Doc. 12 at 6; Doc. 12-7 at 3. Stevens stated that she believed the "[T]ribe ha[d] made acceptable progress" on its corrective action plan, and the BIA issued a bill of collection for $3,552,860. Doc. 12-7 at 3–4. The Tribe did not appeal the 2018 Report to the CBCA, U.S. Court of Federal Claims, or federal district court until filing this complaint on October 8, 2021. Doc. 12 at 6. The BIA later determined these questioned costs were duplicative of the 2017 Report and cancelled the debt. Doc. 1 at 16; Doc. 10 at 13–14; Doc. 12-9.

### E. BIA's 2019 Findings and Determinations Report ("2019 Report") and commencement of this lawsuit

In the spring of 2021, the BIA was in the process of completing its 2019 Report. See Doc. 18-2 at 1. On April 30, 2021, Timothy LaPointe, the Tribe's BIA contracting officer, mailed a letter to Chairman Estes by certified mail requesting the Tribe's response to the BIA's preliminary report findings. Doc. 18-2 at 1. Chairman Estes responded on May 5, 2021, stating that the Tribe did not contest the BIA's preliminary finding that it incurred an unearned revenue deficit of $4,800,477 for the 2019 fiscal year. Doc. 17 at 2; Doc. 18-2 at 1.

12

However, as Chairman Gourneau had argued in 2017, Chairman Estes asserted that the Tribe had enough cash *and capital assets* to collateralize its 2019 deferred revenue deficit and affirmed that the Tribe was continuing to work on its corrective action plan. Doc. 1 at 16; Doc. 18-2 at 2. Chairman Estes anticipated that the Tribe would incur a revenue deficit of $1,941,274 for the 2020 fiscal year, the lowest unearned revenue deficit the Tribe had incurred for several years. Doc. 18-2 at 2. Chairman Estes then ask the BIA to suspend its debt collections efforts and to award the Tribe TCSA funds in the future. Doc. 18-2 at 2. Chairman Estes claimed such relief was necessary for the Tribe to continue providing essential services during the COVID-19 pandemic. Doc. 1 at 16–17; Doc. 18-2 at 2.

On August 20, 2021, the BIA mailed the 2019 Report for the fiscal year ending September 30, 2019, by certified mail to Chairman Estes. Doc. 10 at 14; Doc. 12 at 7; Doc. 12-10. The report found that the Tribe had an unearned revenue deficit of $4,800,577 for 2019 due to overspending of its general fund. Doc. 12-10 at 4. Unlike in previous years, the Tribe filed an administrative appeal of the BIA's 2019 Report with the CBCA on December 1, 2021, challenging the 2019 Report. Doc. 10 at 14; Doc. 12 at 7. The appeal is currently pending. Doc. 10 at 14; Doc. 12 at 7.

On October 8, 2021, the Tribe filed this complaint raising five counts: (1) detrimental reliance; (2) violation of the ISDEAA; (3) violation of a treaty, statutory, and common law trust duty; (4) violation of the APA, (5) violation of the Equal Protection and Due Process clauses of the U.S. Constitution. Doc. 1 at 19–24. The Defendants suspended all debt collection efforts after the complaint was filed.[3] Doc. 10 at 20; Doc. 11 at 5–7; Doc. 17 at 6. At that point, the Department

---

[3] The Tribe's complaint sought a preliminary injunction to prevent further debt collection. Doc. 1 at 21. Because debt collection efforts have been suspended, the Tribe now agrees that a preliminary injunction is unnecessary. Doc. 17 at 6.

of the Treasury had seized or withheld from the Tribe over $4,350,000 in federal funds,[4] including almost $3,000,000 in federal funding earmarked for health services such as COVID prevention and ambulatory services, pursuant to the BIA's bills of collection. Doc. 1 at 17; Doc. 10 at 12. The Tribe states that it will not be able to provide services to its members if Defendants continue to collect on the debt. Doc. 17 at 6–7.

The complaint had named the Department of the Treasury, the Bureau of Fiscal Service, and Commissioner of the Bureau of Fiscal Service Timothy Green (collectively "Treasury Defendants") on a theory that they were liable to the Tribe for collecting debt on behalf of Defendants. Doc. 1 at 4–5. On March 23, 2022, the parties filed a Joint Stipulation for Dismissal with Prejudice as to the Treasury Defendants, Doc. 19, which this Court granted, Doc. 21. The remaining Defendants now have filed a motion to dismiss for lack of subject matter jurisdiction, arguing that the ISDEAA, CDA, and the Administrative Procedure Act ("APA") have not waived sovereign immunity for the Tribe's claims. Doc. 9.

## II. Legal Standard

Defendants bring their motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Doc. 9 at 1; Doc. 10 at 15. On a motion to dismiss under Rule 12(b)(1), the standard of review depends on whether the defendant is making a facial attack or factual attack on subject matter jurisdiction. Stalley v. Catholic Health Initiatives, 509 F.3d 517, 520–21 (8th Cir. 2007). When a defendant makes a facial attack to challenge whether the facts alleged in the complaint establish subject matter jurisdiction under Rule 12(b)(1), the plaintiff is afforded similar safeguards as in a Rule 12(b)(6) motion. Osborn v. United States,

---

[4] At the motion hearing on July 29, 2022, the Tribe's attorney asserted that Defendants had withheld or over-collected $986,000, although this Court is unsure for what year or years or period of time that over-collection amount covers.

14

918 F.2d 724, 729 n.6 (8th Cir. 1990). Namely, the Court must "accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law," and determine whether the plaintiff's alleged facts "affirmatively and plausibly suggest" that jurisdiction exists. Stalley, 509 F.3d at 521. A court's review then is limited to the face of the pleadings. Branson Label, Inc. v. City of Branson, 793 F.3d 910, 914 (8th Cir. 2015).

On the other hand, when a defendant attacks the factual basis for subject matter jurisdiction, a court can consider matters outside the pleadings, "and the non-moving party does not have the benefit of 12(b)(6) safeguards." Osborn, 918 F.2d at 729 n.6. "A factual attack occurs when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction." Davis v. Anthony, Inc., 886 F.3d 674, 679 (8th Cir. 2018) (cleaned up and citation omitted). In that case, "no presumptive truthfulness attaches to the plaintiff's allegations," and a "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn, 918 F.2d at 730 (citation omitted). Defendants consider their motion to dismiss to be a facial attack or alternatively, an attack for failure to state a claim under 12(b)(6). Doc. 10 at 15 n.16. Therefore, the Court's standard of review of incorporates Rule 12(b)(6) safeguards.

## III.  Discussion

The counts alleged by the Tribe are a bit ill-defined. The complaint can be fairly read to allege the following claims: (1) disputing the BIA's findings and determinations under 25 U.S.C. § 2507(e); (2) alleging a failure to provide technical assistance under 25 U.S.C. § 2505(c)(3); (3) detrimental reliance; (4) breach of trust; and (5) violation of due process and equal protection. This Court discusses each of these claims in turn in deciding whether these claims can survive a motion to dismiss.

### A. Dispute of the BIA's Findings and Determinations under 25 U.S.C. § 2507(e)

"A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text." Lane v. Pena, 518 U.S. 187, 192 (1996). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999) (citation omitted). "A waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Lane, 518 U.S. at 192.

As discussed, the TCSA and ISDEAA waive sovereign immunity for disputes concerning "[a]ny exception or problem cited in an audit conducted pursuant to section 2505(b)(1) of [the TSCA's annual reporting requirement]. 25 U.S.C. § 2507(e). However, pursuant to the CDA, a tribal grant recipient must file any action concerning such a dispute within twelve months of the receipt of the government's final decision in a federal district court or the court of federal claims, lest the action be time barred. 25 U.S.C. § 2507(e); 25 U.S.C. § 5331(a); 41 U.S.C. § 7103(g); 41 U.S.C. § 7104.

The Tribe argues that its complaint does not contest the 2016 Report, 2017 Report, and 2018 Report, and therefore, the twelve-month deadline imposed by the CDA would not apply. Doc. 17 at 2. Alternatively, the Tribe claims that Chairman Gourneau's March 27, 2019, letter substantially complies with the spirit of the CDA's requirement to bring an appeal concerning the 2016 Report within twelve months. Doc. 1 at 13; Doc. 17 at 2–3. Likewise, the Tribe argues Chairman Estes' May 5, 2021, letter substantially complies with the CDA's twelve-month deadline to appeal the 2017 Report and 2018 Report. Doc. 17 at 2–3. Defendants respond that the Tribe's suit is completely barred for failure to appeal within the twelve-month deadline and further that the deadline should not be tolled because the Tribe was repeatedly advised of its appeal rights. Doc. 10 at 15–18; Doc. 23 at 2–7.

The March 27, 2019 and May 5, 2021 letters do not dispute the 2016 Report, 2017 Report, 2018 Reports' questioned costs but request relief in the form of suspending debt collection and awarding the Tribe additional TCSA funding. Doc. 18-1; Doc. 18-2. Yet, the Tribe's argument that it had sufficient assets to collateralize its debt could be construed as disputing the 2016 Report, 2017 Report, and 2018 Reports' findings that only cash and cash equivalent assets can be considered collateral for the Tribe's debt. See Doc. 18-1; Doc. 18-2. Regardless, the letters from the Tribe's chairmen do not comply with the plain terms of the ISDEAA and CDA requiring a contracting party to file an action concerning a self-determination contract dispute within twelve months of receiving notice of the federal government's actions on that contract in the U.S. Court of Federal Claims or a federal district court. 25 U.S.C. § 2507(e); 25 U.S.C. § 5331(a); 41 U.S.C. § 7103(g); 41 U.S.C. § 7104; 25 C.F.R. § 900.222.

The Tribe also argues that any deadlines to file a complaint under the CDA and ISDEAA should not apply to the question of the sufficiency of the Tribe's assets to collateralize the debt because the Tribe did not receive notice of Chatmon's internal memo until April 2021. Doc. 1 at 11. The Tribe claims that had it received notice of Chatman's opinion that capital assets could not be considered collateral for the Tribe's debt sooner, it would have appealed the 2016 Report and 2017 Report sooner. Doc. 1 at 11. The Tribe also claims that it was unaware that it needed to file an appeal with the CBCA, the U.S. Court of Federal Claims, or federal district court because the BIA did not respond to Chairman Gourneau's letter dated March 27, 2019. Doc. 1 at 14; Doc. 17 at 2.

These arguments are creative but ultimately unpersuasive. The time to file an action under the ISDEAA and CDA does not turn on when the United States discloses an internal memo, but on the government's final decision. 25 U.S.C. § 2507(e); 25 U.S.C. § 5331(a); 41 U.S.C. §

7103(g); 41 U.S.C. § 7104. The Tribe filed this complaint on October 8, 2021, over a year after it received notice of the final decisions in the 2016 Report, 2017 Report, and 2018 Report. Doc. 1; Doc. 12-1; Doc. 12-4; Doc. 12-7. The Tribe received notice of their dispute rights in the cover letter to each report; although the cover letters did not reference the Tribe's right to appeal in federal district court, they gave notice of the statutes governing the Tribe's appeal rights. Doc. 12-1; Doc. 12-4; Doc. 12-7. Contra Decker & Co. v. West, 76 F.3d 1573, 1579 ("The issue is whether any defect in the notice . . . is sufficient to deprive the notice of its legal effect"). The cover letter also provided notice that the ISDEAA and CDA required any complaints concerning a contract dispute to be brought within twelve months. Doc. 12-1; Doc. 12-4; Doc. 12-7. Because the Tribe did not bring suit within twelve months of receiving the 2016 Report, 2017 Report, and 2018 Report, the Tribe may not bring a claim under 25 U.S.C. § 2507(e) to challenge the decisions in those reports.

At oral argument, the Tribe's attorney disavowed that the Tribe was challenging or seeking to appeal from the Defendants' calculation of amounts to be repaid, although claiming that for some period BIA has over-collected by $986,000. Parts of the complaint allege that the Defendants made duplicative findings; assessed over $2 million in administrative costs, interest, and penalties; and then acknowledged its error, yet did not restore any of the erroneously collected funds. Doc. 1 at 16. The Complaint is less than clear under what cause of action claims of duplicative findings, excess administrative costs, and over-collection fits; this Court believes that the Tribe should be given an opportunity in the wake of this opinion and order to amend its complaint, if it wishes, to state claims regarding such matters. Nothing in this opinion and order should be read to foreclose amendment of the complaint to state a claim regarding such things as excess administrative costs

18

and overcollection of amounts owed, and the twelve-month limitation period may not bar such claims.

### B. Failure to Provide Technical Assistance under 25 U.S.C. § 2505(c)(3)

25 U.S.C. § 2505(c)(3) states that "[t]he Secretary shall provide such technical assistance to enable the school and governing body to carry out such remedial actions." 25 U.S.C. § 2505(c)(3). In support of various claims, the Tribe alleges that Defendants failed to offer it technical assistance to assist it in undertaking remedial measures addressing the BIA's findings and determinations reports. Doc. 1 at 17; Doc. 17 at 5, 7. The "touchstone for determining whether [a] statute confers [a] private right of action is congressional intent." Anthony v. Cattle Nat. Bank & Tr. Co., 684 F.3d 738, 739 (8th Cir. 2012) (citation omitted). "[F]or implied-right-of-action cases, [the] underlying statute must create [a] remedy." Id. at 740 (citation omitted). "[E]ven where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent to create not just a private *right* but also a private *remedy*." Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (citation omitted).

25 U.S.C. § 2507(e) incorporates the ISDEAA to govern "[a]ny exception or problem cited in an audit" conducted pursuant to the TCSA. 25 U.S.C. § 2507(e). In contrast, 25 U.S.C. § 2505 creates no such remedy for a violation to provide technical assistance. Rather, 25 U.S.C. § 2505 merely defines the duties of the Secretary of the Interior to assist the Tribe in undertaking remedial action. 25 U.S.C. § 2505. As such, 25 U.S.C. § 2505(c)(3) cannot be read to create a private right of action. See Anthony, 684 F.3d at 739–40 (holding a statute establishing the "rights and obligations among depository institutions, federal banking agencies, and Congress" without creating a remedy for violations thereof did not create a private right of action); Wisniewski v.

19

Rodale, Inc., 510 F.3d 294, 295, 308 (3d Cir. 2007) (holding § 3009 of the Postal Reorganization Act, which "regulates the shipment of unordered merchandise," did not create an implied private right of action when "the language and structure of the statute provide no support for a private right of action, and [the plaintiff had] not pointed to anything in the circumstances of the statute's enactment or any other factors that express the requisite intent"); El Paso Nat. Gas Co. v. United States, 774 F. Supp. 2d 40, 49 (D.D.C. 2011) (rejecting a claim that Indian Lands Open Dump Cleanup Act ("ILODCA"), 25 U.S.C. § 3901 et seq., created a private right of action when the "text of the statute does not suggest any intent by Congress to create a private right of action. Indeed, ILODCA focuses on the regulating agency's obligations, and not on the rights of the protected party, i.e., the Indian tribes.").

More specifically, the Tribe alleges the APA, 5 U.S.C. § 702, waives sovereign immunity for its claim that Defendants failed to provide technical assistance under 25 U.S.C. § 2505(c)(3). Doc. 1 at 22; Doc. 17 at 7.  5 U.S.C. § 702 states "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. . . ." 5 U.S.C. § 702. "As a procedural statute, the APA provides no substantive requirements, but merely provides the framework for judicial review of agency action. . . . Accordingly, there is no right to sue for a violation of the APA in the absence of a relevant statute whose violation forms the basis for the complaint." Preferred Risk Mut. Ins. Co. v. United States, 86 F.3d 789, 792 (8th Cir. 1996) (cleaned up and citations omitted). Here, 25 U.S.C. § 2505 is the statute the Tribe contends provides a basis for relief.

"A plaintiff seeking judicial review of agency action under the APA . . . must . . . meet the constitutional requirements of standing." Courtney v. Smith, 297 F.3d 455, 460–61 (6th Cir. 2002); see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S.

209, 224 (2012) ("This Court has long held that a person suing under the APA must satisfy . . . Article III's standing requirements."). To have standing, a plaintiff must show:

> (1) that he has suffered an injury in fact that is actual or imminent, not conjectural or hypothetical; (2) that the injury is causally connected to the defendant's allegedly illegal conduct and not to the independent action of some third party not before the court; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision

Wieland v. U.S. Dep't of Health & Hum. Servs., 793 F.3d 949, 954 (8th Cir. 2015) (cleaned up and citation omitted). "[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." Patchak, 567 U.S. at 224 (cleaned up and citation omitted). If a plaintiff has satisfied these requirements, § 706 of the APA then "provides that the reviewing court shall set aside agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" Preferred Risk Mut. Ins. Co., 86 F.3d at 792 (quoting § 706(2)(A)).

The Tribe has not shown, or even alleged, that it "suffered an injury in fact that is actual or imminent, not conjectural or hypothetical" from Defendants' alleged failure to "provide such technical assistance to enable the school and governing body to carry out such remedial actions." Doc. 1 at 17–18, 22; Doc. 17 at 7; Wieland, 793 F.3d at 954; 25 U.S.C. § 2505(c)(3). The Tribe merely states that Defendants "failed to substantially carry out [their] obligations to provide technical assistance to address the root causes of the audit findings" and lists miscellaneous other ways it believes Defendants failed in carrying out their duties under the provisions of the TCSA and the Tribe's TCSA contract. Doc. 1 at 17–18, 22; Doc. 17 at 7. To state a claim under the APA for refusal to provide technical assistance would require substantially different allegations than what the Tribe has plead. See Wall v. Michigan Rental, 852 F.3d 492, 495 (6th Cir. 2017) (stating that a plaintiff may not "establish an injury in fact merely by identifying a violation of [a] law in

21

the absence of actual damage"); Dakota Res. Council v. N. Dakota Pub. Serv. Comm'n, No. 1:12-CV-064, 2013 WL 12085480, at *6 (D.N.D. Sept. 3, 2013) (holding a plaintiff did not show an injury-in-fact when it had "not identified, in either the complaint or the summary judgment motion, a specific permit request, application, amendment, or termination decision as the basis for any alleged injury").

### C. Detrimental Reliance

In support of its "detrimental reliance" claim, the Tribe argues that the BIA accepted the Tribe's argument "equity in capital assets and other equity" could collateralize the Tribe's unearned revenue deficit in the BIA's 2012, 2013, 2014, and 2015 findings and determinations reports. Doc. 1 at 19; Doc. 17 at 5. For those fiscal years, the BIA "reinstated the questioned costs" and "declined to issue a bill of collection" for the Tribe's unearned revenue deficits. Doc. 1 at 20; Doc. 17 at 5. The Tribe alleges it detrimentally relied on the BIA's acceptance of its collateralization argument and was injured when the BIA "reversed its practice" and began to issue bills of collection for unearned revenue deficits each year. Doc. 1 at 20. The Tribe cites no authority under which they bring this "detrimental reliance" claim except for the Declaratory Judgment Act, 28 U.S.C. § 2201. Doc. 1 at 20; Doc. 17 at 5.

This count also fails to state a claim for which relief can be granted. "The [Declaratory Judgment Act] does not extend the jurisdiction of the federal district courts. . . . It simply expands the range of remedies available in the federal courts." Smith, 888 F. Supp. 2d at 953 (cleaned up and citations omitted); see also Pub. Water Supply Dist. No. 10 of Cass Cnty. v. City of Peculiar, 345 F.3d 570, 572 (8th Cir. 2003) (citation omitted) ("The Declaratory Judgment Act did not extend federal court jurisdiction . . . but only enlarged the range of remedies available.").

### D. Breach of Trust Duty

22

The Tribe alleges Defendants violated its general trust duty to provide services and federal funding to the Tribe under the ISDEAA, the Snyder Act of 1921, the Treaty of Fort Laramie, and federal common law by collecting debt and limiting its TCSA funding. Doc. 1 at 21–22; Doc. 17 at 7. Due to this breach of trust, the Tribe contends that the debt collection was unlawful and has threatened the Tribe's eligibility for additional federal grants if it is unable to continue providing services under its current self-determination contracts. Doc. 1 at 18–19. Further, the Tribe alleges that the debt collection brought the Tribe dangerous close to insolvency and impeded its ability to provide healthcare, educational, and law and order services to its members. Doc. 1 at 18–19; Doc. 17 at 6–7. The Tribe alleges that The Department of the Treasury has seized or diverted over $4,350,000 in federal funds from the Tribe, including almost $3,000,000 in federal funding earmarked for health services such as COVID prevention and ambulatory services, pursuant to the BIA's bills of collection. Doc. 1 at 17.

The Supreme Court of the United States has repeatedly recognized "the undisputed existence of a general trust relationship between the United States and the Indian people." United States v. Mitchell, 463 U.S. 206, 225 (1983); United States v. Navajo Nation, 537 U.S. 488, 506 (2003); United States v. Jicarilla Apache Nation, 564 U.S. 162, 176 (2011). "The existence of a trust duty between the United States and an Indian or Indian tribe can be inferred from the provisions of a statute, treaty or other agreement, 'reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people.'" Blue Legs v. U.S. Bureau of Indian Affs., 867 F.2d 1094, 1100 (8th Cir. 1989) (quoting Mitchell, 463 U.S. at 225). However, "establishing a general trust relationship, though far from irrelevant, does not end the inquiry. . . . The analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." El Paso Nat. Gas Co, 774 F. Supp. 2d at 51 (citing Navajo Nation, 537

U.S. at 506). "Thus, in order to bring a claim for breach of trust, the Tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" Id. (quoting Navajo Nation, 537 U.S. at 506); see also Rosebud Sioux Tribe v. United States, 450 F. Supp. 3d 986, 995 (D.S.D. 2020), aff'd, 9 F.4th 1018 (8th Cir. 2021) (citing Blue Legs, 867 F.2d at 1100) ("When a tribe, as here, seeks equitable relief rather than money damages, it . . . must point to a substantive source of duty-imposing law and allege that the Government breached that duty.").

When determining whether a duty exists, a court resolves ambiguities in statutes and treaties in favor of the Tribe. Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians . . . with ambiguous provisions interpreted to their benefit."); Oneida Cty., v. Oneida Indian Nation of New York States, 470 U.S. 226, 247 (1985) ("[I]t is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.") (citations omitted). Although a substantive source of law is required to establish and define an actionable fiduciary duty owed by the Government, the Supreme Court has recognized the moral responsibility the United States owes to Indian tribes. "The Government, following a humane and self[-]imposed policy, has charged itself with moral obligations of the highest responsibility and trust . . . obligations to the fulfillment of which the national honor has been committed." Jicarilla Apache Nation, 564 U.S. at 176 (cleaned up and citation omitted).

Federal common law, the ISDEAA, the Treaty of Fort Laramie, and the Snyder Act, do not establish a substantive source of law establishing a specific fiduciary duty requiring the United States to abstain from collecting from a lawful debt that a tribe owes to the United States. "There is no federal general common law." Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

24

"Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." City of Milwaukee v. Illinois, 451 U.S. 304, 312 (1981). The TSCA does not limit the government's ability to recover the Tribe's debt but explicitly authorizes the BIA to reassume control of tribal schools in certain circumstances. 25 U.S.C. §§ 2501–2511.

Further, the Tribe refers only generally to the Treaty of Fort Laramie and the Snyder Act to support its claim the Defendants violated a general trust duty towards the Tribe. Doc. 1 at 21–22; Doc. 17 at 3, 5, 7. The Tribe cites no provision in either that "establishes [a] specific fiduciary or other dut[y]" that it alleges the government has breached. Doc. 1 at 21–22; Doc. 17 at 3, 5, 7; Navajo Nation, 537 U.S. at 506. In Yankton Sioux Tribe v. U.S. Department of Health & Human Services, the Eighth Circuit affirmed the dismissal of a claim that the government had "violated its federal trust responsibility" in closing a local Indian Health Services emergency department when the tribe had not alleged a violation of any statutory or treaty obligation. Yankton Sioux Tribe, 533 F.3d 634, 644 (8th Cir. 2008). In that case, "[t]he [Yankton Sioux] Tribe's vague allegation that the government violated its federal trust responsibility [was] not sufficient to state a claim." Id.

The Eighth Circuit has recognized that the United States has a specific trust duty to provide healthcare services to Indian people in certain circumstances, but those circumstances are not present here. For instance, in White v. Califano, the Eighth Circuit held that the federal government had a responsibility to provide and pay for the involuntary commitment of an indigent, mentally ill member the Oglala Sioux Tribe. White, 581 F.2d 697, 697 (8th Cir. 1978) (per curiam). Recently, in Rosebud Sioux Tribe v. United States, the Eighth Circuit, affirming a decision of the undersigned, held that the federal government has a duty to provide competent,

physician-led health care to the Rosebud Sioux Tribe based, in part, on the language of the 1868 Treaty of Laramie and the Snyder Act of 1921. Rosebud Sioux Tribe, 9 F.4th 1018, 1024 (8th Cir. 2021, aff'g 450 F. Supp. 3d 986 (D.S.D. 2020). The 1868 Treaty of Fort Laramie was entered into by the Sioux Indians, consisting of the "Brulé, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee" people. Rosebud Sioux Tribe v. United States, No. 3:16-CV-03038-RAL, 2017 WL 1214418, at *6 n.4 (D.S.D. Mar. 31, 2017). It provided, among many other things, that in exchange for mutual peace and vast forfeiture of land by the Sioux Nation, "the United States hereby agree[d] to furnish annually to the Indians the physician . . . and that such appropriations shall be made from time to time, on the estimate of the Secretary of the Interior, as will be sufficient to employ such persons." Rosebud Sioux Tribe, 450 F. Supp. 3d at 996. The Snyder Act of 1921 imposed a more general duty on the government to protect and support of the health of Indian people. It "instruct[ed] federal agencies to 'direct, supervise, and expend such moneys as Congress may from time to time appropriate, for' among other things, 'relief of distress and conservation of health' of Indians throughout the United States." Id. (quoting 25 U.S.C. § 13); see also Blue Legs, 867 F.2d at 1100. The Snyder Act further "require[ed] the BIA to exercise an overriding duty of fairness when dealing with Indians." Blue Legs, 867 F.2d at 1100.

The Lower Brule Indian Reservation was once part of the Great Sioux Indian Reservation, and the duty set forth in Rosebud Sioux Tribe extends to this Tribe as well. See Rosebud Sioux Tribe, 2017 WL 1214418, at *6 n.4 (noting Brule tribe included in 1868 Treaty of Fort Laramie). Unlike in Rosebud Sioux Tribe, however, the Tribe has not alleged that Defendants breached any particular duty under the Snyder Act or the 1868 Treaty of Fort Laramie, such as the duty to provide competent, physician-led health care. Doc. 1 at 21–22; Doc. 17 at 3, 5, 7. This case also

26

presents a far different circumstance; in Rosebud Sioux Tribe federal officials closed the emergency department on the reservation and initiated a divert-status approach to direct tribal members to off-reservation emergency departments at times quite distant from reservation communities. Rosebud Sioux Tribe, 450 F. Supp. 3d at 992. Here, the Tribe has not and likely cannot allege that Defendants violated the government's duty under the 1868 Treaty of Fort Laramie or the Snyder Act by collecting on the Tribe's debt in a way that allegedly affects health care funding but has not eliminated competent, physician-led healthcare or violated some other recognized trust duty. Defendants' motion to dismiss the Tribe's claim for violation of trust is granted without prejudice to the Tribe amending its complaint if it can tether the collection or non-collection activities to a particular trust duty.

### E. Violation of Due Process and Equal Protection

The Tribe asserts Defendants violated the equal protection and due process rights of tribal members by collecting debt and thus depriving the Tribe of money needed to support the Tribe's welfare without notice and a hearing.[5] Doc. 1 at 22–24. "To have a property interest in a benefit," protected by the due process clause,

a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . Such entitlements are, of course, not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.

Keating v. Nebraska Pub. Power Dist., 660 F.3d 1014, 1017 (8th Cir. 2011) (citations omitted).

---

[5] The Tribe also alleges that it has a substantive due process right to healthcare, which was threatened by the debt collection. Doc. 1 at 23–24. However, the "Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Pollard v. D.C., 191 F. Supp. 3d 58, 80 (D.D.C. 2016) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989)); see also Lee v. Pine Bluff Sch. Dist., 472 F.3d 1026, 1029 (8th Cir. 2007).

27

"The requirements of procedural due process apply only to governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." United States v. Long, 977 F.2d 1264, 1276 (8th Cir. 1992) (cleaned up and citation omitted); see also Demming v. Hous. & Redevelopment Auth., of Duluth, 66 F.3d 950, 953 (8th Cir. 1995). "The relevant consideration for [a procedural due process] analysis is a two-part inquiry. We must determine (1) whether the [Tribe was] deprived of a protected interest, and if so, (2) what process was due." Schneider v. United States, 27 F.3d 1327, 1333 (8th Cir. 1994).

The Tribe did not dispute Defendants' findings and determinations on the Tribe's unauthorized use of certain TCSA funds leaving a deficit in funds. The Tribe has no claim of any property interest that prevents the BIA from collecting the Tribe's debt. The Fifth Amendment's due process protections do not extend to prevent the federal government from collecting lawful debt pursuant to the ISDEAA. See Educ. Assistance Corp. v. Cavazos, 902 F.2d 617, 627 (8th Cir. 1990) (citation omitted) (holding a recipient of federal funds authorized by a federal statute for the "limited purpose" of executing a federal program did not have a property interest under the Fifth Amendment); Chinook Indian Nation v. U.S. Dep't of Interior, 435 F. Supp. 3d 1130, 1142 (W.D. Wash. 2020) (rejecting an Indian's tribe's claim that the BIA violated its procedural and substantive due process rights by cutting off the tribe's federal funding upon finding that the tribe had no "legitimate property interest in the funds"). Further, the Tribe has not alleged it was denied a hearing pursuant to the provisions of the ISDEAA or that it requested but was denied such a hearing. See Doc.1 at 22–24; Doc. 17 at 2–7. The Tribe has not stated a viable due process claim.

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws" as under the

28

Fourteenth Amendment.  <u>United States v. Windsor</u>, 570 U.S. 744, 774 (2013) (citing <u>Adarand</u>

<u>Constructors, Inc. v. Pena</u>, 515 U.S. 200, 217–18 (1995)).  The Equal Protection clause of "the

Fourteenth Amendment requires that all persons subjected to legislation shall be treated alike,

under like circumstances and conditions, both in the privileges conferred and in the liabilities

imposed."  <u>Engquist v. Oregon Dep't of Agric.</u>, 553 U.S. 591, 602 (2008) (cleaned up and citation

omitted).  "Thus, when it appears that an individual is being singled out by the government, the

specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a

rational basis for the difference in treatment."  <u>Id.</u> (cleaned up and citation omitted).  The Tribe

has not alleged sufficient facts suggesting Defendants' actions denied the Tribe equal protection

under the law.

### IV.  Conclusion and Order

For the reasons discussed, it is hereby

ORDERED that Defendants' Motion to Dismiss, Doc. 9, is granted to an extent.  The Tribe

may seek leave within the next twenty-one days to file an amended complaint (and must attach

the proposed amended complaint under D.S.D. CIV LR 15.1) regarding alleged over-collection

and improper administrative to clarify what claims are being stated for such matters.  However,

none of the causes of action as presently alleged in the Complaint appear to state a claim.

DATED this 12ᵗʰ day of September, 2022.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

29