UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| LOWER BRULE SIOUX TRIBE, A FEDERALLY RECOGNIZED INDIAN TRIBE;<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, UNITED STATES BUREAU OF INDIAN AFFAIRS, KRISSANNE STEVENS, OR HER SUCCESSOR, AWARDING OFFICIAL FOR THE BUREAU OF INDIAN AFFAIRS GREAT PLAINS REGION; THE UNITED STATES OF AMERICA, DOUG BURGUM, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR; BRYAN MERCIER, ACTING ASSISTANT SECRETARY FOR INDIAN AFFAIRS; AND STEPHANIE CONDUFF, ACTING DIRECTOR OF THE BUREAU OF INDIAN AFFAIRS;<br>Defendants. | 3:21-CV-03018-RAL<br><br><br>OPINION AND ORDER GRANTING SUMMARY JUDGMENT |

The Lower Brule Sioux Tribe ("the Tribe") entered into a self-determination contract under the Tribally Controlled Schools Act ("TCSA") with the federal government, in which the Tribe received federal funds to operate tribal schools that otherwise would have been operated by the federal government. Doc. 1 at 1–2. The Tribe used monies received under the TCSA to fund tribal government operations other than schools, creating an "unearned revenue deficit," ultimately prompting the government to collect the deficit through offsets from monies the Tribe otherwise would have received. Doc. 1 at 9–24; Doc. 32 at 7–15. The Tribe filed its original Complaint against the Bureau of Indian Affairs ("BIA"), the Department of Interior ("DOI"), and certain of its representatives (collectively "Defendants"), seeking to enjoin Defendants from collecting debt

1

incurred by the Tribe and entering declaratory judgment relief.  Doc. 1.  The Tribe's original complaint had five claims: (1) disputing the BIA's findings of "unearned revenue deficits"; (2) alleging a failure of Defendants to provide technical assistance; (3) detrimental reliance; (4) breach of trust; and (5) violation of due process and equal protection.  Doc. 1; see Doc. 27 at 15. Defendants filed a motion to dismiss for lack of subject matter jurisdiction.  Doc. 9.  While not explicit in the original complaint, the Tribe also claimed that Defendants had collected more than the total unearned-revenue balance.  For reasons explained at length, this Court on September 12, 2022, granted in large part the Defendants' motion to dismiss the original complaint but allowed the Tribe to seek leave "to file an amended complaint . . . regarding alleged over-collection."  Doc. 27 at 29.  The main reason for dismissing the bulk of the Tribe's claims was that its original complaint was filed more than a year after receipt of many of the contracting officer's decisions being challenged, such that the sovereign immunity waiver under 25 U.S.C. § 5331(a) and 41 U.S.C. § 7104(b)(3) would not extend.

The Tribe obtained leave and filed its Amended Complaint, Doc. 32, which substituted a single claim for the previous five claims.  Some of the factual allegations in the Amended Complaint duplicate assertions in the original complaint, which prompted Defendants to file a motion to dismiss the Amended Complaint.  See Doc. 37.  Because there was enough alleged in the Amended Complaint to plead a single claim concerning whether the federal government has overcollected and what amount remains to be repaid, if any, by the Tribe for the unearned-revenue-deficits balance, this Court denied Defendants' Motion to Dismiss Amended Complaint.  Doc. 56. Though commenting that "the Tribe's single cause of action is no model of clarity," this Court refused to dismiss "the narrow claim in the Amended Complaint—alleging overcollection due to final decisions made on or after October 8, 2020," and possible relief in the form of a declaratory

judgment as to what amount was still owed or overpaid.  Doc. 56 at 10.  This Court concluded that all other claims remained foreclosed by sovereign immunity.  Id.  Defendants subsequentially answered the Amended Complaint, Doc. 57, and after discovery closed, filed a motion for summary judgment.  Doc. 61.

## I.    Undisputed Matters of Law and Fact

### A. The Indian Self-Determination and Education Assistance Act, the Contract Disputes Act, and the Tribally Controlled Schools Act

The Tribe's claim arises out of its treatment of funds received under the TCSA.  Several statutes govern the Defendants' waiver of sovereign immunity, the grant of jurisdiction to federal district courts, and in turn the ability of the Tribe to sue the federal government and challenge its decision-making in the administration of self-determination contracts.

Congress passed the Indian Self-Determination and Education Assistance Act ("ISDEAA"), Pub. L. No. 93-638, 88 Stat. 2203 (codified as amended in 25 U.S.C. §§ 5301–10, 5321–32), in 1975 to allow Indian tribes to assume control of federally administered educational and social programs.  25 U.S.C. § 5302; Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1456 (10th Cir. 1997), superseded by statute, 25 U.S.C. § 5326, as recognized in San Carlos Apache Tribe v. Becerra, 53 F.4th 1236 (9th Cir. 2022); see also Stathis v. Marty Indian Sch. Bd. Inc., 560 F. Supp. 3d 1283, 1298 (D.S.D. 2021) ("Congress has made clear that having Native American communities and tribes control the education of their children promotes [tribal self-determination and cultural autonomy].").  "Congress enacted the ISDEAA to encourage Indian self-determination and tribal control over administration of federal programs for the benefit of Indians, by authorizing self-determination contracts between the United States, through the Secretaries of the Interior and of Health and Human Services, and Indian tribes."  Demontiney v. United States

ex rel. Dep't of Interior, Bureau of Indian Affs., 255 F.3d 801, 806 (9th Cir. 2001) (citation omitted). Pursuant to these contracts, "Secretaries [of the Interior and of Health and Human Services] are required to transfer resources and control of those programs to the tribe." Ramah Navajo Chapter, 112 F.3d at 1456.

"In 1988, Congress amended the ISDEAA to waive federal sovereign immunity in federal district court for certain contract claims" brought by tribes under the statute. Demontiney, 255 F.3d at 806. The amendment language provides:

> The United States district courts shall have original jurisdiction *over any civil action or claim against the appropriate Secretary arising under this chapter and, subject to the provisions of [25 U.S.C. § 5331(d)] and concurrent with the United States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this chapter*. In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this chapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this chapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 5331(a) (emphasis added). In turn, § 5331(d) incorporates the Contract Disputes Act ("CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (codified as amended in 41 U.S.C. §§ 7101–7109), to claims brought under the ISDEAA. See 25 U.S.C. § 5331(d) (stating "Chapter 71 of Title 41 shall apply to self-determination contracts" brought under this chapter). In short, both the ISDEAA and the CDA govern disputes between the federal government and a tribe arising under the ISDEAA. See Swinomish Indian Tribal Cmty. v. Azar, 406 F. Supp. 3d 18, 24 (D.D.C. 2019) (holding the CDA and ISDEAA gave a federal district court subject matter jurisdiction over a claim brought by a tribe against the federal government arising from a self-determination contract).

Like the ISDEAA, "the CDA is a statute waiving sovereign immunity." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1329 (Fed. Cir. 2010) (citation omitted). The CDA governs disputes arising from an express or implied contract between an executive agency of the federal government and the contracting party. 41 U.S.C. § 7102. "Congress enacted the CDA [in 1978] to provide a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving government contract claims." Montano Elec. Contractor v. United States, 114 Fed. Cl. 675, 680 (2014) (cleaned up and citation omitted). In relevant part, the CDA provides different ways for appealing a federal agency's decision concerning a contracting party, such as a tribal recipient of a self-determination contract:

> (a) Appeal to agency board.--A contractor, within 90 days from the date of receipt of a contracting officer's decision under section 7103 of this title, may appeal the decision to an agency board as provided in section 7105 of this title [to the Civilian Board of Contract Appeals ("CBCA")].

> (b) Bringing an action de novo in Federal Court.--

>> (1) In general. . . . in lieu of appealing the decision of a contracting officer under section 7103 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary. . . .

>> . . . .

>> (3) Time for filing.--A contractor shall file any action under paragraph (1) . . . *within 12 months from the date of receipt of a contracting officer's decision under section 7103 of this title.*

41 U.S.C. § 7104 (a)–(b) (emphasis added). Because the ISDEAA incorporates the CDA, a federal district court has concurrent jurisdiction with the United States Court of Federal Claims over a claim arising under the ISDEAA that was filed "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b)(3); see also Demontiney, 255 F.3d at 806 (holding that § 5331(a), (d) of the ISDEAA grant a federal "district court concurrent jurisdiction

[with the U.S. Court of Federal Claims] over suits against the federal government for contract claims arising under 'self-determination contracts' as defined by the ISDEAA").

The Code of Federal Regulations summarizes a tribal grant recipient's appeal rights succinctly: "You may appeal [a final] decision [under the ISDEAA] to the Civilian Board of Contract Appeals (CBCA) . . . within 90 days from the date you receive [the final] decision. . . . Instead of appealing to the CBCA, you may bring an action in the U.S. Court of Federal Claims or in the United States District Court *within 12 months of the date you receive*" notice of the final decision. 25 C.F.R. § 900.222 (emphasis added). An appeal must be timely commenced under the CDA as incorporated by the ISDEAA, otherwise a "contracting officer's decision on a claim is final and conclusive and is not subject to review by any forum, tribunal, or Federal Government agency, unless an appeal or action is timely commenced as authorized by this chapter." 41 U.S.C. § 7103(g).

In 1988, the same year the ISDEAA was amended to incorporate the CDA, Congress enacted the TCSA, which "requires the Secretary of the Interior to award grants to Indian tribes or tribal organizations to operate schools on their reservations if requested by a tribe." Shiprock Associated Sch., Inc. v. United States, 934 F. Supp. 2d 1311, 1313 (D.N.M. 2013); 25 U.S.C. § 2501. Like the ISDEAA, the TCSA was enacted "to assure maximum Indian participation in the direction of educational services." 25 U.S.C. § 2501; Stathis, 560 F. Supp. 3d at 1298 (citation omitted). A tribal grant recipient under the TCSA is authorized to use federal funds to operate tribal schools in compliance with the provisions of the statute. 25 U.S.C. § 2502.

The TCSA requires a tribal grant recipient to complete an annual report. 25 U.S.C. § 2505(b). The report must include an annual financial audit conducted pursuant to the Single Audit Act of 1984 on the tribe's use of federal funds, which the BIA reviews to ensure the tribe's

compliance with the provisions of the TCSA. 25 U.S.C. § 2505(b)(1)(B). The audit "shall be conducted by an independent auditor in accordance with generally accepted government auditing standards," and the auditor "shall report on the results of any audit." 31 U.S.C. §§ 7502(c), (g). The auditor will issue a schedule of findings and questioned costs that outline any suspected "[m]aterial noncompliance with the provisions of Federal statutes, regulations, or the terms and conditions of Federal awards related to a major program." 2 C.F.R. §§ 200.515–.516. A questioned cost may include a deferred revenue deficit issue. Doc. 78-1 at 2 (providing the Bureau of Indian Affairs's Single Audit Report Handbook for 2016). A grant recipient then "must prepare a corrective action plan [("CAP")] to address each audit finding included in the auditor's report for the current year." 2 C.F.R. § 200.511.

The grant recipient then must submit a reporting package which includes the auditor's report and the CAP to a Federal clearinghouse. 31 U.S.C. § 7502(h). The grant recipient must also provide the annual report to the tribal governing body of the tribally controlled school, and within thirty days of "receiving written confirmation that the tribal governing body has received the report," the grant recipient "shall send a copy of the report to the Secretary [of the Interior] ("the Secretary")." 25 U.S.C. § 2505(b)(4)(A)–(B). "The Indian Affairs (IA) Division of Internal Evaluation and Assessment (DIEA) has been designated as the office to receive Single Audit reports from Indian Tribes and Tribal organizations." Doc. 78-1 at 1. An Awarding Official ("AO") "must review the audit report and CAP . . . and determine whether the planned actions will address the federal award finding(s)." Id. at 4. The AO must also "determine whether the questioned costs should be sustained (disallowed) or . . . reinstated (allowed)" and issue a Findings and Determination (F&D). Id. at 5. If the AO "has determined that certain costs are disallowed, these amounts are debts owed by the recipient to the DOI Secretary." Id. at 11. The AO then

sends the recipient the F&D and an appeal notice informing the recipient of its appeal rights under

25 C.F.R. § 900.222. Id. at 3.

Significantly, the TCSA incorporates the ISDEAA, and by doing so thereby incorporates

the CDA, to govern disputes arising from a TCSA contract: "Any exception or problem cited in

an audit conducted pursuant to section 2505(b)(1) of this title [the TSCA's annual reporting

requirement] . . . shall be administered under the provisions governing such exceptions, problems,

or disputes in the case of contracts under the Indian Self-Determination and Education Assistance

Act." 25 U.S.C. § 2507(e). As discussed, § 5331(a) of the ISDEAA then states that a federal

court's jurisdiction over "any civil action or claim against the appropriate Secretary arising under

this chapter [is] *subject to the provisions of [the CDA] and concurrent with the United States Court*

*of Claims.*" 25 U.S.C. § 5331(a) (emphasis added). Therefore, pursuant to the ISDEAA and the

CDA, a TCSA tribal grant recipient must file any federal district court action concerning an

"exception or problem cited in an audit conducted pursuant to" the Single Audit Act or a TCSA

contract dispute with the federal government within twelve months of the receipt of the

government's final decision. 25 U.S.C. § 2507(e); 25 U.S.C. § 5331(a); 41 U.S.C. § 7104.

Otherwise, a federal court may not exercise jurisdiction, and the action is barred. 41 U.S.C.

§ 7103(g).

If the recipient does not appeal the AO's decision in the F&D within the time set forth in

25 C.F.R. § 900.222, "a request to issue a Bill for Collection should be sent to the Interior Business

Center [(IBC)]." Doc. 78-1 at 7. However, a bill of collection to recover disallowed costs may

not issue unless the Secretary "provided notice of any such disallowance within three hundred and

sixty-five days of receiving any required annual single agency audit report." 25 U.S.C. § 5325(f).

"Debts that are 180 days delinquent will be referred by IBC to Treasury for further collection

action." Doc. 78-1 at 11. Moreover, "agencies shall charge interest, penalties, and administrative costs on debts owed to the United States pursuant to 31 U.S.C. 3717." 31 C.F.R. § 901.9.

The Tribe was a TCSA grant recipient. Doc. 1 at 1–2; Doc. 10 at 2; Doc. 12 at 2. As a contracting party to a TCSA self-determination contract, the Tribe was required to complete an annual report and financial audit on its use of TCSA funds and to submit the report to the Secretary of the Interior. 25 U.S.C. § 2505(b)(4)(B). This case arises from the BIA's final determinations on the Tribe's audit report for fiscal year 2017 and BIA collection actions that ensued.

### B. The BIA's Findings and Determinations Reports from 2017 to 2020

#### 1. Fiscal Year 2017

The Tribe submitted its annual audit report for Fiscal Year Ended September 30, 2017, to the Federal Audit Clearinghouse on November 21, 2018. Doc. 62 at 1; Doc. 73 at 2. On March 20, 2019, the BIA, Great Plains Regional Office, issued its Fiscal Year 2017 F&D on the Tribe's audit report for Fiscal Year Ended September 30, 2017 (2017 F&D). Doc. 62 at 2; Doc. 73 at 2; Doc. 64-3. The BIA mailed the Tribe's chairman, Boyd Gourneau, the 2017 F&D on March 20, 2019, by certified mail. Doc. 62 at 2; Doc. 73 at 2-3. Trish Lundell, on behalf of the Tribe, signed for the mail in March 2019.[1] Doc. 62 at 2; Doc. 73 at 3. The 2017 F&D included a cover letter notifying the Tribe of its right to appeal to the CBCA within ninety days of the receipt of the 2017 F&D or the U.S. Court of Federal Claims within twelve months of the date of receipt. Doc. 62 at 3; Doc. 73 at 3; Doc. 64-3 at 1. The cover letter also stated that the 2017 F&D was the BIA's final decision. Doc. 64-3 at 1.

---

[1] Although a Return Receipt was requested, Lundell did not provide a specific day in March on the Return Receipt. Doc. 64-4.

In the 2017 F&D, Defendant Krissanne Stevens, who was the AO assigned to the Tribe's audit report, sustained questioned costs of $3,679,223. Doc. 62 at 3; Doc. 73 at 4; Doc. 64-3 at 3. Stevens found that the Tribe used TCSA grant money to fund other programs and general fund activities. Doc. 62 at 3; Doc. 73 at 4; Doc. 64-3 at 3. Stevens further found that the Tribe did not have enough cash assets to reimburse the $3,679,223 in questioned costs or "unearned revenue" deficit created by the Tribe's overspending. Doc. 64-3 at 3. The 2017 F&D stated that the Tribe had admitted to overspending and stated it would "strive to maintain the funds for federal programs in the restricted savings account and transfer as needed to cover expenditures." Doc. 62 at 3-4; Doc. 73 at 4; Doc. 64-3 at 4. The 2017 F&D also notified the Tribe that the BIA would issue a payment restriction letter barring the Tribe from receiving additional TCSA funds. Doc. 62 at 4; Doc. 73 at 4; Doc. 64-3 at 4. The Tribe did not appeal the 2017 F&D to the CBCA within 90 days after receipt nor to the U.S. Court of Federal Claims or to a federal district court within 365 days after receipt. Doc. 62 at 3; Doc. 73 at 3. Indeed, the Tribal Comptroller responded: "There is no disagreement with this finding. The Tribe's management is working towards rectifying the continued overspending of funds that result in the deficient fund balances." Doc. 62 at 3–4; Doc. 73 at 4; Doc. 63-4 at 4.

On March 30, 2020, the BIA, Great Plains Regional Office requested that the DOI's IBC issue a bill of collection to the Tribe, with instructions to credit for collection the sum of $3,679,223. Doc. 62 at 4; Doc. 73 at 4; Doc. 64-5. The DOI issued a Bill of Collection (Bill No. 1801914086) to the Tribe related to the 2017 F&D for the sum of $3,679,223 on June 10, 2020. Doc. 62 at 4; Doc. 73 at 5; Doc. 65-2. On August 10, 2020, the DOI issued a Dunning Notice to the Tribe which stated, "If payment is not received within 30 days of this notice, or our office has not been notified of the circumstances delaying payment, further collection action will

be initiated, such as referral to the Department of Treasury for collection." Doc. 62 at 4; Doc. 73 at 5; Doc. 65-3. On December 9, 2020, the bill of collection was referred to the Department of Treasury for collection. Doc. 62 at 5; Doc. 73 at 5. To satisfy the debt, the Department of Treasury, Fiscal Service, conducted 47 offsets against federal monies otherwise owed to the Tribe. Doc. 62 at 5; Doc. 73 at 5. An offset of $1,400,218 on or about April 30, 2021, representing Indian Health Services CARES Act funding granted to the Tribe, was reversed and refunded to the Tribe on or about June 14, 2021. Doc. 62 at 5; Doc. 73 at 5-6.

To date, the Treasury has collected $3,107,643.70 of which $2,665,349.64 have been posted to the principal balance, $441,626.71 have been posted to interest, administrative fees, and penalties, and $667.35 for Treasury fees. Doc. 62 at 5; Doc. 73 at 6. Defendants asserts that the remaining unpaid balance is $1,013,873.36. Doc. 62 at 5. The Tribe disputes the remaining balance. Doc. 73 at 6. The bill of collection was inactivated on October 21, 2021, after the commencement of this lawsuit, and thus no interest or fees are presently accruing. Doc. 12 at 5; Doc. 62 at 5; Doc. 73 at 6.

### 2. Fiscal Year 2018

On July 2, 2019, the Tribe submitted its annual audit report for Fiscal Year Ended September 30, 2018 (Report No. ARTT 2018-6075) to the Federal Audit Clearinghouse. Doc. 62 at 6; Doc. 73 at 7. On November 5, 2019, the BIA mailed Clyde J.R. Estes, the Tribe's new chairman, the FY 2018 Findings and Determination with respect to the Tribe's FY 2018 single audit report (2018 F&D) by certified mail. Doc. 62 at 6; Doc. 73 at 7. Trish Lundell on behalf of the Tribe signed for the mail on November 8, 2019. Doc. 62 at 6; Doc. 73 at 7.

Like in 2017, the cover letter of the 2018 F&D stated that the Tribe had a right to dispute the 2018 F&D to the CBCA within ninety days and the U.S. Court of Federal Claims within twelve

months of receipt of the report.  Doc. 62 at 6; Doc. 73 at 7.  The 2018 F&D questioned costs of
$3,552,860.  Doc. 62 at 6; Doc. 73 at 8.  Again, Stevens found that the Tribe continued its practice
of borrowing "forward-funded grant monies to fund other programs and general fund
activities."  Doc. 62 at 6-7; Doc. 73 at 8.  The 2018 F&D noted that the Tribe responded that it
would "continue to look for ways to improve oversight over accounting records."  Doc. 62 at 7;
Doc. 73 at 8.  The Tribe did not appeal the 2018 F&D to the CBCA, U.S. Court of Federal Claims,
or federal district court.  Doc. 62 at 6; Doc. 73 at 8.

On June 10, 2020, the DOI issued a bill of collection related to the 2018 F&D to the Tribe
(Bill No. 1801914087) for the sum of $3,552,860.  Doc. 62 at 7; Doc. 73 at 8.  The bill of collection
was referred to the Department of Treasury, Fiscal Service for offsets.  Doc. 62 at 7; Doc. 73 at
9.  To satisfy the debt, the Department of Treasury, Fiscal Service, conducted 18 offsets against
federal monies otherwise owed to the Tribe, totaling $671,794.92.  Doc. 62 at 7; Doc. 73 at 9.  The
BIA later determined these questioned costs were duplicative of the 2017 F&D and cancelled the
debt.  Doc. 62 at 7; Doc. 73 at 9.  The collections made against the FY 2018 debt were refunded
and then applied to the bill of collection related to FY 2017 debt on June 15, 2021.  Doc. 62 at 7;
Doc. 73 at 9.

### 3.  Fiscal Year 2020

On December 30, 2021, the Tribe submitted its audit report for Fiscal Year Ended
September 30, 2020, to the Federal Audit Clearinghouse.  Doc. 64-9; Doc. 62 at 8; Doc. 73 at 10.
The report listed the unearned revenue deficit for the TCSA fund at $1,981,756.  Doc. 64-9 at 16.
The report also stated that in Fiscal Year 2020, "the Tribe determined that indirect costs
expenditures could be allocated to certain grant programs in the Tribally Controlled Schools fund
for fiscal years 2010 through 2019 resulting in an understatement of indirect cost reimbursements

. . . and an overstatement of unearned revenue and amounts due from other funds in the Tribally Controlled Schools fund." Doc. 64-9 at 50. Accordingly, the Tribe made "prior period adjustments" to its TCSA fund accounting and applied them retroactively for fiscal years 2010 to 2019. Doc. 62 at 8; Doc. 73 at 9; Doc. 74-6 at 2. The Tribe claimed that the prior period adjustments reflected indirect costs incurred by the Tribe that should have been attributed to TCSA programs, but that the Tribe had neglected to do since Fiscal Year 2010. Doc. 62 at 8; Doc. 73 at 10; Doc. 66-3 at 12. To calculate the prior period adjustments for Fiscal Year 2010 through Fiscal Year 2019, the Tribe used the indirect cost rates for the respective fiscal year to account for expenses incurred by the Tribe relating to its administration of its schools. Doc. 62 at 8; Doc. 73 at 10; Doc. 66-3 at 9-10.

Before including these adjustments in its audit report, the Tribe contacted Dr. Kimberly Corkin at the BIE regarding the propriety of entering the indirect cost prior period adjustments in the audit. Doc. 74-2 at 9. Dr. Corkin advised the Tribe to follow the advice of their auditors. Id.; Doc. 83-1. In November 2023, the BIA issued the FY 2020 Findings and Determination with respect to the Tribe's FY 2020 single audit report (2020 F&D). The 2020 F&D did not dispute nor explicitly endorse the Tribe's inclusion of the adjustments in its FY 2020 audit report. Doc. 74-2 at 11; Doc. 82-1. The Tribe now claims that the "prior period adjustments" applied to Fiscal Years 2010 through 2019 render the Defendants' withholdings for the Fiscal Year 2017 Bill of Collection to be excessive and resulted in an overpayment.

### C. The Tribe's Position on Allegedly Disputed Facts

The Tribe does not contest that the deferred revenue deficit for Fiscal Year 2017 as captured by the 2017 F&D was $3,679,223. Doc. 62 at 3; Doc. 73 at 4; Doc. 64-3 at 3. Nor is there any dispute that the Defendants have collected $3,107,643.70 through offsets on the Fiscal

Year 2017 debt and that $2,665,349.64 has been applied to the principal balance. Doc. 62 at 5; Doc. 73 at 6. The Tribe contests no part of the Defendants' Statement of Undisputed Material Facts other than what should be considered the remaining balance or whether overcollection occurred. Doc. 73.

The Tribe filed a Statement of Disputed Material Facts, asserting that "prior period adjustments" applied in the Tribe's Fiscal Year 2020 audit reduces the amount the Tribe owes and that when collections began in December of 2020, the deferred revenue balance was less than the bill of collection amount. Doc. 75. Defendants do not contest that the Tribe's subsequent accounting alters certain calculations but maintain that such accounting changes are immaterial to the grounds for summary judgment.

## II.    Standard of Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Motg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary

judgment." <u>Thomas v. Corwin</u>, 483 F.3d 516, 527 (8th Cir. 2007). Cases alleging discrimination are subject to the same summary judgment standard as any other case. <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

### III.    Discussion

The Tribe in short advances two different theories to support its assertion that the Defendants have overcollected. First, the Tribe argues that the deferred revenue deficits in each Fiscal Year between Fiscal Years 2010 to 2019 were overstated. In its Fiscal Year 2020 audit report, the Tribe noted that it had "determined that indirect costs expenditures could be allocated to certain grant programs in the Tribally Controlled Schools fund for fiscal years 2010 through 2019 resulting in an understatement of indirect cost reimbursements . . . and an overstatement of unearned revenue and amounts due from other funds in the Tribally Controlled Schools fund." Doc. 64-9 at 50. Accordingly, the Tribe made "prior period adjustments" to its TCSA fund accounting and applied them retroactively for Fiscal Years 2010 to 2019. Doc. 62 at 8. Based on these "prior period adjustments," the Tribe argues that the Fiscal Year 2017 deficit is lower than initially reported.

Second, the Tribe argues that the Defendants should have re-calculated the principal balance of the debt subject to collection at the time collection commenced, which was in December 2020, rather than pursue the $3,679,223 deferred revenue deficit in the 2017 F&D which was issued in March 2019. The Tribe argues the principal balance of the deferred revenue deficit at the time collection commenced was $1,981,756. Doc. 75 at 1.

In response, Defendants maintain that the debt resulting from the 2017 F&D became fixed once the Tribe failed to appeal and that the debt amount under the 2017 F&D cannot decrease, fluctuate, or otherwise change except through the offsets. Doc. 77 at 2. Defendants further argue

that the Tribe's attempt to implement "prior period adjustments" despite failing to appeal the 2017 F&D is impermissible and would disrupt finality as contemplated by the ISDEAA, CDA, and Single Audit Act. Id. at 5. This Court will address both theories of overcollection, starting with the prior period adjustments.

### A. Prior Period Adjustments

Between Fiscal Year 2010 and Fiscal Year 2017, the Tribe alleges that it failed to attribute indirect costs totaling $2,776,078 to its TCSA fund. Doc. 74-6 at 2. After accounting for the prior period adjustments, the Tribe argues that the deferred revenue deficit in Fiscal Year 2017 should have been just $859,890 and not $3,679,223. Doc. 76 at 5. Using this figure, the Tribe recalculated interest, penalties, and fees. Doc. 83-3. As a result, the Tribe argues that Defendants overcollected $2,184,250.56. Id.

The Tribe's argument is a veiled way of contesting the 2017 F&D's sustainment of questioned costs in the amount of $3,679,223. The Tribe essentially is arguing that it or its accountants erred in audits from 2010 to 2019 because they should have attributed indirect costs to the TCSA funds, and now doing so reduces the 2017 F&D deferred revenue deficit. The Tribe's opportunity to challenge the 2017 F&D has passed, erecting a sovereign immunity bar to contesting the amount now. As noted above, the TCSA incorporates the limited waiver of sovereign immunity found in the ISDEAA. A TCSA tribal grant recipient must file any federal district court action concerning an "exception or problem cited in an audit conducted pursuant to" the Single Audit Act or a TCSA contract dispute with the federal government within twelve months of the receipt of the government's final decision. 25 U.S.C. § 2507(e). A decision on a claim is "final and conclusive and is not subject to review by any forum, tribunal, or Federal Government agency, unless an appeal or action is timely commenced as authorized by [the CDA]." 41 U.S.C.

§ 7103(g); see also Cosmic Construction Co. v. United States, 697 F.2d 1389, 1390 (Fed. Cir. 1982) (holding the deadlines to file suit in the CDA are "part of a statute waiving sovereign immunity, which must be strictly construed, and which defines the jurisdiction of the tribunal").

The Tribe received the 2017 F&D in March 2019. Doc. 62 at 2; Doc. 73 at 3. Accordingly, the United States' waiver of sovereign immunity did not extend beyond March 2020. The Tribe did not challenge the 2017 F&D until filing the current action on October 8, 2021, well beyond the one-year deadline. The Tribe's argument that the Government has overcollected on the 2017 debt in light of the Tribe's prior period adjustments is a challenge to the amount of the 2017 F&D's determination of disallowed costs. The absence of a waiver of sovereign immunity forecloses such a challenge to the 2017 F&D determination.

The Tribe suggests that Defendants accepted the prior period adjustments by referring the Tribe to its accountant on the propriety of such adjustments and then not contesting the findings in the Tribe's Fiscal Year 2020 audit. The Tribe cites to no authority that such prior period adjustments can alter or reduce a bill of collection, and the Tribe's argument has the flavor of an equitable estoppel or detrimental reliance claim. While the contours of when an equitable estoppel claim may be made against the federal government are less than clear, the Supreme Court of the United States in Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 60 (1984), albeit in dicta, stated that a party "surely cannot prevail [on an estoppel claim against the United States] without at least demonstrating that the traditional elements of an estoppel claim are present." In Heckler, the Court approvingly cited to the Restatement (Second) of Torts § 894(1) which provides the elements of an equitable estoppel defense:

> (1) If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act . . . the first person is not entitled

17

> (b) to regain property or its value that the other acquired by the act, if the
> other in reliance upon the misrepresentation and before discovery of the
> truth has so changed his position that it would be unjust to deprive him of
> that which he thus acquired.

Restatement (Second) of Torts § 894. The Court further elaborated that "the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." Id. at 59. The Tribe has made no showing that Defendants made a definite misrepresentation of fact or that there was such detrimental reliance by the Tribe.

Moreover, the Court has drawn a limited clear line, holding equitable estoppel cannot apply against the United States in a suit to recover "public funds." Off. of Pers. Mgmt. v. Richmond, 496 U.S. 414 (1990). The Court recognized that "judicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized." Id. at 426. Should the Court hold otherwise, it would "render the Appropriations Clause a nullity." Id. at 428. In short, Defendants' response to the Tribe to consult its accountant and acceptance of the Fiscal Year 2020 audit does not somehow estop the Defendants from collecting on the prior bill of collection.

When this Court denied the Defendants' second motion to dismiss the Amended Complaint for lack of subject matter jurisdiction, the Tribe's theory for overcollection with respect to the prior period adjustments was not fleshed out. See Doc. 56 at 10 (stating the Tribe's lone claim "is no model of clarity," and refusing to dismiss single claim "alleging overcollection due to final decisions made on or after October 8, 2020"). The Amended Complaint makes no mention of the prior period adjustments. Defendants' motion for summary judgment thus presented the first opportunity to determine whether the Tribe's prior period adjustment argument surmounts the sovereign immunity issues that bar the Tribe's prior causes of action. It does not.

**B. Quantification at Time of Collection**

The Tribe next argues that the debt balance subject to collection must be determined at the moment collection starts rather than at the time a debt is determined. Doc. 32 at 14. The 2017 F&D issued in March 2019 and determined the debt for Fiscal Year 2017 was $3,679,223. Debt collection of that amount did not commence until December 2020, and by that point, the Tribe argues that the deficit had decreased. Doc. 12-4; Doc. 62 at 5. According to the Tribe's Fiscal Year 2020 audit report, the deferred revenue deficit in 2020, the year collection commenced, was $1,981,756. Doc. 66-3 at 9; Doc. 75 at 1. Under this theory, the Tribe argues that the principal balance subject to collection should have been $1,981,756, without taking into account prior period adjustments. Doc. 32 at 14; Doc. 66-2 at 3. Accordingly, the Tribe argues that the Government has overcollected $699,840.53, taking into consideration interest, penalties and fees. Doc. 75 at 2.

The Tribe's argument is creative but finds no support in statute or case law. If the Tribe's argument were deemed to create a genuine issue of material fact, federal government efforts to execute on bills of collection could be continually thwarted by arguments that the debt amount subsequently changed or needs to be reevaluated. The Tribe's argument seeks to circumvent the statutory process and limited sovereign immunity waiver.

The TCSA, by incorporating the ISDEAA's waiver of sovereign immunity, authorizes the Tribe to sue the United States regarding "[a]ny exception or problem cited in an audit conducted pursuant to section 2505(b)(1) of this title." 25 U.S.C. § 2507(e). The Tribe must file any federal district court action concerning an exception or problem cited in an audit within twelve months of receipt of the Government's final decision with respect to the audit. 25 U.S.C. § 2507(e); 25 U.S.C. § 5331(d); 41 U.S.C. § 7104. After reviewing the Tribe's audit package submitted as required by the TCSA, the BIA issued its 2017 F&D which sustained a finding that the Tribe

misspent $3,679,223 of TCSA funds. The $3,679,223 in disallowed costs then became "debts owed by the recipient to the DOI Secretary." Doc. 78-1 at 11. The Tribe did not raise an "exception or problem" to the BIA's 2017 F&D. Indeed, the Tribe admitted to overspending and stated it would "strive to maintain the funds for federal programs in the restricted savings account and transfer as needed to cover expenditures." Doc. 62 at 3-4; Doc. 73 at 4; Doc. 64-3 at 4. There is no genuine dispute regarding the amount of debt owed by the Tribe arising from the Fiscal Year 2017 audit and the 2017 F&D. Rather than raise an "exception or problem" with BIA's 2017 F&D within one year of receipt of the BIA's final decision, the Tribe waited until October 2021 to challenge not the audit, but instead the Defendants' collection efforts on the debt determined in the 2017 F&D. The TCSA does not create a cause of action against the United States for such a claim, and the United States has not waived sovereign immunity for such a claim.

The Tribe provided no authority supporting its contention that collection on a debt resulting from an unearned revenue deficit in 2017 is limited to the balance of the deficit in the fiscal year when collection begins, in this case, 2020. Nor has the Tribe provided any authority supporting its overcollection cause of action. This Court is disinclined to create one under these circumstances.[2]

The Tribe appears to have a remedy through the compromise processes provided in 31 C.F.R. §§ 902.1–.7 to address these matters. "The Debt Collection Act and Federal Claims Collection Standards provide a mechanism for (and a set of standards governing) debt compromise requests, and place the ultimate authority to compromise debts as large as [the Tribe's] in the

---

[2] There is evidence in the record that the Tribe's accounting changes simply move unearned revenue balances from TCSA funds to other grants. Doc. 82-1 at 2 ("As of September 30, 2020, the Tribe's overall unearned revenue balances associated with grant and contract programs of $15,132,648 exceeded the total cash and cash equivalents and investment balances in the government funds of $7,614,776 by $7,517,872.").

Department of Justice . . . ." <u>GLH Commc'ns, Inc. v. FCC</u>, 930 F.3d 449, 459 (D.C. Cir. 2019) (citing 31 C.F.R. § 902.1(b)).  Accordingly, this Court finds no genuine dispute as to material fact relating to the Defendants' entitlement to summary judgment on the Tribe's claims to challenge the amount of the 2017 F&D.

## IV.    Conclusion

For the foregoing reasons, it is

ORDERED that the Defendants' Motion for Summary Judgment, Doc. 61, is granted.

DATED this 13ᵗʰ day of May, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE